Evan A. Schmutz (3680)
Andy V. Wright (11071)
HILL, JOHNSTON & SCHMUTZ, L.L.C.
RiverView Plaza, Suite 3000
4844 North 300 West
Provo, Utah 84604-5663
Telephone: (801) 375-6600
E-Mail: evans@hjslaw.com

     Attorney for Defendants
     BETA TECHNOLOGIES, INC. and CHESTER HEATH

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| NEXMED HOLDINGS, INC.,<br>a Delaware corporation,<br><br>    Plaintiff,<br><br>vs.<br><br>BETA TECHNOLOGIES, INC.<br>a Utah corporation, and CHESTER<br>HEATH, an individual,<br><br>    Defendants. | RULE 26(A)2(B), F.R.Civ.P. EXPERT<br>REPORT OF LYNN G. FOSTER<br><br>Civil Action No.: 2:06CV01014 TC<br><br>District Judge Tena Campbell<br><br>Magistrate Judge David Nuffer |

### NOTIFICATION

This report, among other things, notifies the Plaintiff (NexMed) that the Defendants (Beta and Heath) will use me, Lynn G. Foster, as an expert trial witness.

### QUALIFICATION AND EXPERIENCE

My education and experience is reasonably set forth below.



Lynn G. Foster, born Pocatello, Idaho, November 8, 1932; admitted to bar, 1964, Utah; 1965, Michigan; 1967, ████ 1977, U.S. Supreme Court; ████

*Education*: Brigham Young University and University of Michigan (B.S.E. 1959); George Washington University (J.D. 1964). Delta Theta Pi; Tau Beta Pi. Member, George Washington University Law Review, 1962-1963. ████ Registered Professional Engineer. *Member*: ████ Licensing Executives Society; National Society of Professional Engineers. ████

## PREPARATION

I reviewed and analyzed 

## SUBJECT MATTER BROADLY OF TESTIMONY

My engagement concerns ████

## SPECIFIC TESTIMONY AND OPINIONS

The Factual Basis of Testimony

The basis in support my opinions set forth herein comprise factual evidence of record or to be made of record as identified below and as contained in Exhibits attached hereto.

1.      In essence, the '352 device applies a constant direct current from a 9 volt power battery to a herpes lesion site. The '352 device was replicated, as shown in Figure 1A and tested for its current output at the probes as a function of time. One of the battery terminals was connected to a straightened paper clip probe, as shown in the Figure 1A below. The other battery terminal was connected to a second straightened paper clip probe, except that a small (330 ohm) resistor was also connected in series. The magnitude of the resistor was a small fraction of the typical resistance of a lip, so as not to perturb significantly the current output. The current output was about 27 milliamps when the probes were electrically connected.



Figure 1A

LaFollette Expert Report (Exh. "J"), page 3.

2.      A second '352 device was tested, the one shown in Figure 1B, and obtained the same results.

3



Figure 1B

LaFollette Expert Report (Exh. "J"), page 3-4.

3. For any steady state lip condition (dry, moist or very wet), the flow of constant direct current into the body at the lip occurred as shown in Figure 2, independent of the current delivery times and independent of repeat intervals. The current flow will vary somewhat from the value sown in Figure 2 depending on the amount of moisture on the surface of the lip.



Time (Sec)

Figure 2

LaFollette Expert Report (Exh. "J"), page 4.

4. The measured space between the probes was varied within range of ½" to 1½" in respect to the configuration of Figure 1A, but the spacing of Figure 1B is fixed within the spacing range disclosed in the '352 Patent. LaFollette Expert Report (Exh. "J"), page 5.

4

5.     Next the two '352 probes were placed on LaFollette's lips for fifteen seconds. The constant direct current flow caused significant pain and left burns and welts on his lips. Thus, it is LaFollette's position that the '352 device and its operation are harmful. LaFollette Expert Report (Exh. "J"), page 5.

6.     Since the '352 device has no off/on switch, the current flow starts when the probes are manually placed against the lip and stops only when the probes are manually removed from the lip. LaFollette Expert Report (Exh. "J"), page 5.

7.     The '352 current was measured with a standard current measuring device, which, other than a brief and small spike at start-up, showed the current to be constant and unidirectional for each steady state lip moisture condition. LaFollette Expert Report (Exh. "J"), page 5.

8.     Both the Cold Sore Inhibitor and the Viral Inhibitor Pro (herein collectively the "Inhibitor", but sometimes called the "Beta device") were tested as to the characteristics of current direction and flow into the body. LaFollette Expert Report (Exh. "J"), page 5.

9.     During use, the probes of the Inhibitor were placed in contact with a human lip and the device was manually activated by pressing a button. The Inhibitor is illustrated in attached Figure 3.



Figure 3

LaFollette Expert Report (Exh. "J"), pages 5-6.

10. Current was measured as function of time using the current delivery times and repeat intervals disclosed in the '352 Patent. This process was repeated numerous times, with different conditions of the lip (wetness). In every case, the current flowed first in one direction when the device was activated, but the magnitude of the current in the one direction decreased over time, so it was not constant. After a time of slightly less than 10 seconds the direction of the current essentially instantaneously reversed so that current flow was in the opposite direction. This reverse current flow decreased in magnitude over a time of slightly less than 10 seconds. The current then stopped as the device automatically became inactive. The graph of figure 4 depicts the flow of current from the Inhibitor into the body, where the lip is slightly moist.



Figure 4

LaFollette Expert Report (Exh. "J"), page 7.

11.     The probes were placed on LaFollette's lip and he was not shocked. He felt only the painless sensation of a small applied voltage. He received no burns or welts. LaFollette Expert Report (Exh. "J"), page 7.

12.     In respect to the operation of the Inhibitor (aka Beta device), it is LaFollette's opinion that the current flow from the Beta device into the body is neither constant nor unidirectional, but rather variable over time and bidirectional. LaFollette's Expert Report (Exh. "J"), page 7.





8





27.     The patent in suit is U.S. 5,133,352 ('352).  Exh. "G".

28.     The '352 patent was filed in the U.S. Patent Office (USPO) as Serial No. 508,840

on April 12, 1990.







39.     The asserted '352 patent claims, as constructed by the Court, mandate that the protected current be low voltage **constant unidirectional** DC. (Doc 201, the Claim Construction Order). The court defines the terms "low DC voltage" and "low DC electrical voltage" as: "*a voltage that results in a* **constant unidirectional** *flow not to exceed 30 milliamps.*"



14



45.     The '352 patent has undergone a first reexamination (1st Re) and a second reexamination (2nd Re). In the 1st Re, it was held that all of the limitations of the '352 claims were met by the Diethelm patent, except for the probe spacing of ½ to 1 ½ inches, which was the sole reason for approving amended '352 claims in the 1st Re. Exh. "P", page 2 ("the prior art of record...does not disclose or reasonably suggest to one of ordinary skill in the art the step of applying the voltage to the skin at two points spaced apart from ½ to 1 ½ inches.").

46.     The 2nd Re sustained the decision in the 1st Re, holding, in respect to the Diethelm and Swartz patents only, that the probe spacing limitation of ½ to 1 ½ inches was the sole basis for approving the '352 claims.





e clear disclosure in the '352 patent that the ½ to 1 ½

inch probe spacing is not critical, but only "***typical***".  (Emphasized.)  Exh. "G" ('352 patent),

column 6, lines 64 – 65.

54.  [REDACTED] the Csanyi patent, which passes low voltage DC into the human body through electrodes or probes 37 and 38 "spaced a few centimeters apart." "Exh. "V", the Figures and page 2, column 2, line 130.

55.  Also, a commercially available rectangular 9 volt power battery of the type proposed for use in the '352 device and actually used in the Beta device reads on the '352 claims, if inverted so the power connector terminals, acting as probes, directly contact the skin on opposite sides of a herpes lesion and are held there for the requisite time.







20







94.     The Beta device can be successively activated by U.S. end users so that current

flows to the user for longer than the one minute limitation of Claim 5. The use of the Beta

device by the end users can later be reused at intervals of time greater than two hours, where Claim 5 mandates intervals of less than two hours.

95. The end users in the U.S. may use the Beta device after precursor symptoms have developed herpes lesions, ████████████████████████████████████████

████████████████████████

96. The end users in the U.S. may use the Beta device for greater than the 3 to 20 seconds required by Claims 7 and 13 and /or at intervals other than 45 to 75 minutes, also as required by Claims 7 and 13.

97. The end users in the U.S. may use the Beta device at irregular intervals of time or at regular intervals of time greater than two hours, in contradiction of Claims 5 and 10.

98. The end users in the U.S. may not continue periodic applications of the of Beta device for at least eight hours or until the lesions heal, contrary to Claim 10.















121.    All of the claims of the '250 patent are limited to AC, while the current used by

the Beta device is not AC. 









33



\*    \*    \*    \*









152. The Beta device can be sequentially activated by the end user so that current flows to the user, for longer than the one minute limitation of Claim 5. The Beta device, as used by the end user, can later be reused by the owner at intervals of time *greater* than two hours, where Claim 5 mandates intervals *less* than two hours. █████████████████████████████

███████████████████████████████████████████████████████████

153. The end user in the U.S. may use the Beta device *after* precursor *symptoms* have *developed* herpes lesions, whereas Claims 5 and 7, to the contrary, require precursor symptoms to be *in the developing stage* █████████████████████████████████████████

███████████████████████████████████████████████████████

154. The end user in the U.S. may **use** the Beta device **for greater than the 3 to 20 seconds** contrary to the 3 to 20 seconds mandated by Claims 7 and 13 and/or **at intervals other than 45 to 75 minutes**, also as required by Claims 7 and 13.

155. The end user in the U.S. may use the Beta device at **irregular intervals** of time **or at regular intervals of time greater than two hours**, in contradiction of Claims 5 and 10.

156. The end user in the U.S. **may not continue periodic applications** of the Beta device **for at least eight hours** or until the lesions heal, contrary to Claim 10.











44



















54









Diethelm, except for the probe spacing limitation. A copy of the Examiner's analysis is attached as Exhibit "XX."

(n)     The 1980 Medical Record entitled Tropho-Neurotic Keratitis (Exhibit "VV") discloses, more than 100 years ago, use of electrodes (poles) to apply current from a faradic battery to eyeball nerves afflicted with herpes zoster.





## COMPENSATION

My compensation for preparation and trial testimony will be at the rate of $300.00/hour,

independent of the outcome of this case.

## OTHER CASES

I have not testified as an expert during the last ten years.

## PUBLICATION

I have not published during the last ten years.

Lynn G. Foster

Date: 5-28-09